**GNG GAS SYSTEMS, INC. and E.F. Gouge, Appellants,**

v.

**Harry DEAN, O.J. King and Northstar Gas Co., Inc., Appellees.**

No. 07–95–0273–CV.

Court of Appeals of Texas, Amarillo.

April 4, 1996.

Rehearing Overruled May 9, 1996.

Wauson & Associates, P.C., John Wesley Wauson and Allen D. Russell, Houston, for appellant.

David F. Beale, Houston, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Judge.

GNG Gas Systems, Inc. and E.F. Gouge contend with seven points of error that the take-nothing summary judgment rendered in their contract action against Harry Dean, O.J. King, and Northstar Gas Co., Inc., was rendered in error, or that questions of fact exist to vitiate it. Agreeing, we will reverse and remand.

The recorded evidence reveals that in 1986, Gouge was one of the initial directors and shareholders for Natural Gas Gathering Company of Texas, Inc. (NGGC), and held the positions of vice-president, secretary and treasurer. In 1988, Gouge became chief executive officer of the corporation, and Dean and King were employed as part of the team responsible for operations at NGGC.

Principal assets of NGGC included two operating agreements between the corporation and certain entities known as the Graham entities,[1] covering operations of the Mesa Pipeline System of Utah and the Plains Gathering System in Garza County, Texas (collectively, the Graham contracts). The Graham contracts were negotiated by Gouge on behalf of NGGC, Dean was placed in charge of the Mesa Pipeline System project, and King was in charge of the operation in the field.

Unknown to the other officers and directors, Gouge and a principal with the Graham entities, Kenneth M. McKinny,[2] agreed that the contracts with NGGC would be temporary agreements limited to only a few months, and that Gouge would then resign from NGGC, form his own company, and McKinny would give the Graham contracts to Gouge's new company.

In January of 1990, Gouge resigned from NGGC and formed GNG Gas Systems. To avert attention from Gouge's abrupt departure and the coincidental loss of the Graham contracts, Gouge, Dean, King, and McKinny devised a plan whereby Dean and King would also resign from NGGC, form their own corporation, which they named Northstar Gas Company, Inc., McKinny would negotiate the Graham contracts with them, and the two new companies would share the profits equally. In late January of 1990, Dean resigned, and in February of 1990, King resigned, and the four men implemented their plan by, according to Gouge, an unwritten agreement.

Upon discovery of the loss of the Mesa Pipeline agreement to the new companies headed by its three former employees, NGGC sued Mesa Pipeline Company, the Graham entities, GNG, Gouge, Dean, King and Northstar in Harris County, where at least part of the cause of action accrued and most of the defendants lived or had principal offices.[3] During discovery in the suit, Gouge gave a deposition wherein he admitted that he realized he was wrong in using his influence to usurp business opportunities from NGGC, but felt that NGGC "would certainly do it to me," and added that, "[A]t the time of doing this I knew it was wrong, legally wrong, and if they were the right kind of owners, morally wrong. But since they weren't the right kind of owners, I really didn't care." Further, in connection with a settlement agreement, Gouge provided an affidavit, the pertinent portions of which read:

> In late 1989, I met with an employee of Graham in New Orleans, Louisiana. As a result of that meeting, it was agreed that I would not sign the permanent operating agreement for the Mesa Pipeline system on behalf of NGGC and that I would get the contract after I left NGGC. At this point, our plan was tentative because it was subject to review and approval by Graham upper management.
>
> \* \* \*
>
> McKenny became our regular contact with regard to implementation of a plan to have either me or an entity to be created, with the advice and consent of Graham receive

---

1. The Graham entities consist of Graham Royalty, Ltd., Graham Energy, Ltd., and Graham Resources, Inc., d/b/a Graham Assets Inc., none of which are parties to or affected by the appeal.

2. References to McKinny are to Kenneth M. McKinny, Ken McKenny, and Ken McKenney, since the names, albeit recorded with different spellings, refer to the same person.

3. The real plaintiff was Synder Oil Corporation, to which NGGC had assigned the causes of action, and with which Gouge negotiated to settle the claims against him.

and hold assets of NGGC and, if possible, certain key employees of NGGC.

\* \* \*

[T]hese plans had been approved by senior Graham management and ... were to be kept secret.

Late in 1989, I met Harry Dean and O.J. King at the LaQuinta Hotel on Beltway 8 and I–45 in Houston. This meeting occurred during the business day and started about 3:30 p.m. We were all still employees of NGGC at this time. By this time Henry (sic) Dean and O.J. King were active participants in the plan by Graham and me to take for ourselves the Mesa pipeline deal. In our meeting, we discussed a number of options for implementation of my plan with Graham and ultimately decided that we would form two new corporations. Harry Dean and O.J. King would run an operating company to be formed in the near future and I would run a marketing company. No corporate names were selected at this time. It was agreed at the LaQuinta meeting that I would own one-third of the operating company to be run by Harry Dean and O.J. King. In turn, Harry Dean and O.J. King together would own one-third of the marketing company and I would own the balance. We agreed to joint venture all deals with 50/50 splits of all revenues depending upon who generated the business. We specifically agreed not to put any of this in writing for fear that it would be discovered or be used as evidence against us in a subsequent suit by NGGC or its owners if we were found out.

\* \* \*

[S]hortly after the LaQuinta meeting, Ken McKenny confirmed to us that the Mesa contract would be transferred to the corporation(s) to be formed by us as outlined above.

I told Harry Dean and O.J. King that I would pick the time to resign from NGGC. It was important that our plans be formulated and implementation thereof begun before I gave NGGC notice of my intent to leave the company. I continued to stay with the company for a while but resigned before having to buy anymore (sic) gas.

\* \* \*

Harry Dean and O.J. King formed Northstar. The Mesa Pipeline was bid and thereafter awarded jointly to Northstar/GNG. However, Graham's legal staff decided that the contract should be in the name of Northstar only because Graham thought there would be problems if the company was, on the surface, associated with me because of my high position with NGGC. That is, Graham wanted to keep my true role a secret from NGGC and others.

\* \* \*

The Plains operating contract was conceived at NGGC but awarded to Northstar. This was part of our collaboration with Graham and was pre-arranged.

\* \* \*

Ultimately because Harry Dean and O.J. King controlled the Mesa and Midplains (sic) contracts and were able to starve me out since they controlled all money and because of threats of lawsuits made to Graham by NGGC, they have taken the business opportunities of NGGC for themselves and excluded me. Because Harry Dean and O.J. King did not honor their commitment with me and were in a position to influence Graham, I was eventually excluded in the Graham business activities.

I recognize that what I did was wrong since I was still a director of NGGC when I, Harry Dean, Graham and the others were involved [in] the plan to take assets and business opportunities from NGGC. I believe also that I have been wronged by Harry Dean, O.J. King, and Northstar Gas Co.

In connection with settlement negotiations and as a result of this affidavit, GNG was non-suited with prejudice from the Harris County suit and, later, NGGC dismissed Gouge with prejudice in exchange for a percentage of his recovery against Northstar, Dean and King.[4]

4. Northstar and Dean were also dismissed from

the suit with prejudice according to an order

Premising their action upon the wrong done by Northstar, Dean and King in taking the Graham contracts solely for themselves, GNG and Gouge brought the action underlying this appeal in Garza County, the county of residence of one defendant and the location of at least part of the cause of action, on March 8, 1993. By their live trial pleadings, they alleged breach of contract, fraud, conversion, duress, conspiracy and unjust enrichment.

Answering, Northstar, Dean and King specially excepted to Gouge and GNG's pleadings, generally denied the allegations made against them, and counterclaimed. Northstar, Dean and King alleged that the contract described by Gouge and GNG in their pleadings did not exist; but, if it was found to exist, they sought by the counterclaim a declaratory judgment that the contract was rescinded or abandoned, or was too vague and indefinite to be enforceable, and that there was a failure of consideration. Further, they alleged that they did not steal any contracts from NGGC, nor did they tortiously interfere with NGGC's contracts, and if Gouge did so, he did so without their knowledge, and they counterclaimed for indemnity. Finally, Northstar, Dean and King asserted that if Gouge's affidavit were true, the alleged contract was illegal and unenforceable as a matter of law.

Northstar, Dean and King moved for summary judgment upon the grounds that (1) the contract, assuming its existence, was illegal and, thus, could not be enforced; (2) Gouge was judicially estopped from denying the illegality of the contract; (3 & 4) the statute of frauds and the vagueness of the contract precluded its enforceability; and (5) the statute of limitations barred the suit. The motion was supported by excerpts from the Harris County suit and Dean's affidavit.

GNG and Gouge responded to the motion for summary judgment, and furnished Gouge's affidavit, which stated, in part:

2. Beginning in early 1990 Harry Dean, O.J. King and myself discussed plans to operate and market gas from the Mesa Pipeline System in Utah and the Plains Pipeline System in Utah and the Plains plant and gathering system in Garza County, Texas. We had all had prior experience with these systems while employees of NGGC.

3. I was aware that NGGC would be unable to renew its contracts for the Mesa Pipeline System and the Plains plant and gathering system in Garza County, Texas. In fact, I was advised that the owner of the Mesa system and the Plains plant would not contract with NGGC because of its dire financial and management problems.

4. King, Dean and I agreed in late December, 1989 or January, 1990 that we would form two new companies to handle the operations of Mesa Pipeline system in Utah and the Plains plant and gathering system in West Texas jointly and/or as a joint venture. According to our agreement, Harry Dean and O.J. King would head the operating company and I would head the marketing company.

5. Pursuant to the plan, I created GNG and Dean and King created Northstar. I would bring in the contracts from Graham Resources and others and handle any marketing related functions. O.J. King would handle day to day field operations. Harry Dean would handle day to day office and accounting functions.

6. It was agreed between all parties involved that there would be joint ownership in the new companies. It was further agreed by Dean, King and myself to joint venture all business on a 50/50 split of all net revenues. In particular, it was agreed in late December, 1989 or early January, 1990 at the LaQuinta Motel, Beltway 8 and I-45, in a meeting attended by O.J. King, Harry Dean and myself that I would use my relationship and influence to persuade Graham Resources of Covington, Louisiana to transfer the operations of Mesa Pipeline from NGGC to a new company owned by myself.

7. The Graham executives in control of the contracts had already agreed to transfer the contracts. Dean and King were aware of these facts. Furthermore, Graham had verbally agreed to award the operation of another pipeline and gas pro-

included in the transcript.

cessing system in Garza County, Texas to the company that I was to form.

8. It was agreed two companies would be formed: one, an operating company owned by Dean 30%, King 30% and myself 30% with 10% left in the company. The second would be a marketing company owned 70% by myself and 15% by King and 15% by Dean. An office that would be convenient to myself would be leased near Greenspoint and the two companies would share equally the cost of operating the companies and offices. Revenues from the above projects would be shared as follows: all monies collected would be split 50/50. Each company would then pay one-half of the cost involved.

9. All future business was to be handled as follows: If Dean and King generated an operating account their company would operate the project and earn 100% of that income. If Dean and King generated a marketing opportunity that contract would be turned over to me to operate and they would retain 50% of the margin earned. If I generated an operating contract I would turn over the operation of said contract to Dean and King and retain 50% of the earning for myself. If I generated a marketing contract I would keep 100% of the margin.

Gouge concluded his affidavit by stating that Dean and King formed Northstar and he formed GNG, Northstar obtained the contract which was an original object of the contract and joint venture, and he continued to participate in the joint venture and shared office space with the other parties "until approximately June, 1991."

Granting the summary judgment "as prayed for," the trial court ordered that GNG and Gouge take nothing, specifically declaring that GNG and Gouge had no interest in the Mesa Pipeline or Plains contracts and no right to any stock or other ownership interest in Northstar. All relief not specifically granted was specifically denied, thereby making the judgment final for purposes of appeal. *Mafrige v. Ross,* 866 S.W.2d 590, 592 (Tex.1993).

GNG and Gouge appeal with seven points of error. They contend that the trial court erred in rendering the take-nothing summary judgment because (1) the contract was not an illegal contract; (2) fact issues remain with regard to the legality of the contract; (3) their claims for unjust enrichment survived even if the contract was illegal; (4) Gouge was not judicially estopped to claim the contract was legal, or alternatively, a fact issue exists regarding the estoppel effect of Gouge's prior testimony; (5) the statute of frauds did not bar enforcement of the contract, or alternatively, a fact issue exists regarding the applicability of the statute of frauds; (6) the contract was not unenforceable for vagueness and indefiniteness or, alternatively, a fact issue exists regarding the enforceability of the contract; and (7) the claims were not barred by the statute of limitations, or alternatively, a fact issue exists regarding the date of the accrual of the causes of action and the affirmative defense of limitations. The contentions of error will be addressed in logical progression.

To merit summary judgment, Dean, King and Northstar had the burden to meet, and defeat, GNG and Gouge's cause of action as pleaded, *Torres v. Western Casualty and Surety Company,* 457 S.W.2d 50, 52 (Tex. 1970), by establishing that there exists no genuine issue of material fact and that they were entitled to judgment as a matter of law. *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex. 1972). To do so, they had to show that GNG and Gouge could not, as a matter of law, succeed upon any theory pleaded, *Peirce v. Sheldon Petroleum Co.,* 589 S.W.2d 849, 852 (Tex.Civ.App.—Amarillo 1979, no writ), by conclusively establishing against GNG and Gouge at least one factual element of each theory they pleaded, *Gibbs v. General Motors Corporation,* 450 S.W.2d 827, 828 (Tex. 1970), or by conclusively establishing every factual element of an affirmative defense. *Swilley v. Hughes,* 488 S.W.2d at 67. If Dean, King and Northstar did so, then to avoid their entitlement to summary judgment, GNG and Gouge had to present issues which would preclude summary judgment. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979).

■ Because the trial court's order granting the summary judgment does not specify

the ground or grounds relied upon for the ruling, the judgment will be affirmed on appeal if any of the theories advanced are meritorious. *Rogers v. Ricane Enterprises, Inc.,* 772 S.W.2d 76, 79 (Tex.1989). Conversely, if none of the grounds relied upon is meritorious, the judgment will be reversed. *Id.* at 79–81.

An affirmative defense raised by Northstar, Dean and King in their answer to GNG and Gouge's claims against them, and as grounds in their motion for summary judgment, was that the contract between them to usurp from NGGC the Graham contracts was illegal, and that Gouge was judicially estopped from denying the illegality. In response to the motion for summary judgment, Gouge and GNG contended, and as the bases for their first and fourth points of error they contend, inter alia, that Gouge did not previously say that the joint venture itself was illegal, his prior testimony is not evidence of illegality of the joint venture, and, at most, there is a fact issue whether the agreement between the parties is illegal.

■ In support of the ground of illegality, Dean, King and Northstar rely upon the principle that a contract may be deemed illegal where either it is made or its performance will result in violation of the Constitution, statute or ordinance, or where it is contrary to public policy, or the agreement is to use the subject matter, or a part of it, for an unlawful purpose. *Araiza v. Chapa,* 319 S.W.2d 742, 743 (Tex.Civ.App.—San Antonio 1958, writ ref'd n.r.e.). Conformably, when a corporate officer or director diverts assets of the corporation to his own use, he breaches a fiduciary duty of loyalty to the corporation, *Southwest Livestock & Trucking v. Dooley,* 884 S.W.2d 805, 809 (Tex.App.—San Antonio 1994, writ denied), and the transaction is presumptively fraudulent and void, *Chien v. Chen,* 759 S.W.2d 484, 495 (Tex.App.—Austin 1988, no writ), as being against public policy. *Guaranty Bk. (So. Oak Cliff Bk.) v. National Sur. Corp.,* 508 S.W.2d 928, 931 (Tex.Civ. App.—Dallas 1974, writ ref'd n.r.e.). Dean, King and Northstar also rely upon the principle that a party is judicially estopped in a subsequent proceeding by having alleged or admitted in pleadings in a former proceeding, under oath, the contrary of the assertion sought to be made in the subsequent proceeding, in the absence of proof that the averment in the former proceeding was made inadvertently or by mistake, fraud or under duress. *Highway Contractors, Inc. v. West Tex. Equipment,* 617 S.W.2d 791, 793 (Tex. Civ.App.—Amarillo 1981, no writ).

■ However, Dean, King and Northstar have not shown by this record that the principles of illegality and estoppel are applicable to the agreement in controversy in this litigation. Although Gouge judicially admitted the breach of his fiduciary duty to NGGC, he did not admit that his agreement with Dean and King, upon which he and GNG based their action, was illegal. Interestingly, NGGC, the entity positioned to challenge the legality of the agreement allegedly made by the parties in the present litigation to usurp the Graham contracts, did not seek in its Harris County suit an adjudication that those agreements were illegal; instead, NGGC sought monetary damages stemming from the breach of fiduciary duties owed it by Gouge, Dean, King and their corporations.

Dean, King and Northstar have not cited, nor has our research revealed, any decision adjudicating the question of the legality, as between the parties, of an agreement founded upon the parties' violation of their fiduciary duty to their principal. However, applying general principles applicable to the alleged facts, Dean, King and Northstar are not in a position to defend on the ground that the agreement is illegal.

■ In our review of the summary judgment, we must accept all evidence favorable to Gouge and GNG, the non-movants, as true, indulging every reasonable inference and resolving all doubts in their favor. *Wornick Co. v. Casas,* 856 S.W.2d 732, 733 (Tex. 1993). In this light, the evidence reveals that in arms-length negotiations, mature individuals, in consideration of their mutual promises, agreed to engage in a lawful enterprise, *i.e.,* the operation of a gas pipeline transportation system and the marketing of the gas, with full disclosure of the nature and extent of the property interests involved. Such an agreement is not against public policy, and no

illegality appearing on its face, the agreement will not be held void unless facts showing its illegality are before the court. *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 149 (1947). The fact that the agreement arose from the parties' violation of their fiduciary duty to their principal is not alone sufficient to show the agreement is illegal as to them.

It follows from this record that, Dean, King and Northstar were not entitled to summary judgment on the grounds that the agreement was illegal and Gouge was estopped to claim it was legal. Gouge and GNG's first and fourth points of error are sustained, which moots their second and third points.

■ One of the grounds upon which Dean, King and Northstar moved for summary judgment was that enforcement of the agreement was barred by the statute of frauds, which Gouge and GNG challenge by their fifth point of error, alternatively presenting that a fact issue exists regarding the agreement's enforceability. To support the summary judgment on this ground, Dean, King and Northstar represent that GNG and Gouge alleged an oral agreement to form the two corporations "and for Dean and King to convey 30% of the stock in Northstar to Gouge in exchange for 30% of the stock in GNG" and also "that Gouge agreed to issue 15% of the stock in GNG to Dean and 15% to King." Given this representation, they assert that the oral agreement violates the statute of frauds, which is provided for in the Texas Business and Commerce Code in these words:

> A contract for the sale of securities is not enforceable by way of action or defense unless:
>
> (1) there is some writing signed by the party against whom enforcement is sought ... sufficient to indicate that a contract has been made for sale of a

stated quantity of described securities at a defined or stated price.

Tex.Bus. & Com.Code Ann. § 8.319(1) (Vernon 1991).[5]

However, Dean, King and Northstar's representation attributes more to GNG and Gouge's allegation and Gouge's testimony than what is factually revealed. Although Gouge and GNG pleaded, and Gouge testified, that a part of the agreement was for the parties to form the two corporations and to provide for the percentages of ownership of them, neither the pleadings nor Gouge's testimony contains any mention of the conveyance or issuance of stock in the corporations, nor any complaint that the stock was not conveyed or issued.

To prevail on the statute of frauds defense, Dean, King and Northstar's summary judgment proof must conclusively show that the alleged oral agreement was a contract for the sale of securities. The evidence before the trial court does not show that the subject matter of the agreement was the sale of securities. Moreover, the proof does not show that stock in the corporations was a security as that term is defined in the Code, *viz.*, that the stock (A) was to be issued in bearer or registered form; (B) was of a type commonly dealt in upon securities exchanges or markets commonly recognized in the area in which it was to be issued or dealt in as a medium for investment; and (C) was either one of a class or series or by its terms was divisible into a class or series of instruments; and (D) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer. *See* Tex.Bus. & Com.Code Ann. § 8.102(a) (Vernon 1991).

Resultantly, Dean, King and Northstar have not proved, as a matter of law, that the agreement was a contract for the sale of securities so as to establish their statute of

5. After the summary judgment was rendered, the Legislature revised Chapter 8 of the Business & Commerce Code, effective September 1, 1995, which included the deletion of section 8.319 and, in lieu thereof, a provision rendering the statute of frauds inapplicable in these words:

> A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or

record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making.

Act of June 16, 1995, 74th Leg., R.S., ch. 962, § 1, 1995 Tex.Gen.Laws 4760, 4767 (revised 1995) (current version at Tex.Bus. & Com.Code Ann. § 8.113) (Vernon Supp.1996).

frauds defense. At most, the defense remains a question of fact. *Kenney v. Porter,* 557 S.W.2d 589, 591–92 (Tex.Civ.App.—Corpus Christi 1977, no writ). GNG and Gouge's fifth point of error is sustained.

Another ground upon which Dean, King and Northstar moved for summary judgment was that the agreement was too vague and indefinite to be enforceable, a ground challenged by GNG and Gouge with their sixth point of error. In justification of their ground of vagueness and indefiniteness, Dean, King and Northstar argue that "[t]here are no standards, no stated times, conflicting and vague cost-sharing provisions," but they do not further enlighten us how these items render the agreement vague and indefinite.

 Still, they concede that the agreement was "to form companies, operate businesses, divide profits, and pay expenses on existing and future business." Within Gouge's affidavit response to the motion for summary judgment, reproduced earlier, there are sufficient testimonial facts of the agreement to make it prima facie sufficient certain to enable the court to determine the legal obligations of the parties, *i.e.,* to determine with reasonable certainty the obligations of each party and the conditions under which performance is due, *Bendalin v. Delgado,* 406 S.W.2d 897, 899–900 (Tex.1966), except for the time of implementation. However, it is basic that if the agreement is silent as to the time for performance, the law presumes the parties intended a reasonable time under the particular circumstances. At least, the question of a reasonable time should be submitted to the trier of facts. *Price v. Horace Mann Life Ins.,* 590 S.W.2d 644, 646 (Tex.Civ.App.—Amarillo 1979, no writ).

Thus, resolving all doubts in favor of GNG and Gouge, as we must, Dean, King and Northstar, by merely presenting that there are no standards or stated times and conflicting and vague cost-sharing provisions in the agreement, have not conclusively established that the agreement is too vague and indefinite to be enforced. GNG and Gouge's sixth point of error is sustained.

 The last ground upon which Dean, King and Northstar moved for summary judgment was the two-year statute of limitations, a ground challenged by GNG and Gouge's seventh point of error. Dean, King and Northstar assert that the summary judgment evidence conclusively established that the transaction occurred in the early part of 1990, that Dean's affidavit shows the parties had severed all relationships with each other by December, 1990, and the lawsuit was not brought until the summer of 1993, well over two years after the causes of action allegedly arose.

Yet, even assuming that all of the causes of action alleged, which actually were filed on March 8, 1993, were subject to the two-year statute of limitations, a proposition GNG and Gouge dispute, Dean's affidavit of the severed relationship in December, 1990 contains the qualifying phrase "except that Gouge continued to office in the same suite of offices as us for approximately six months more." Gouge stated, in his earlier recited affidavit, that GNG and he "continued to participate in the joint venture and shared office space with [Dean, King and Northstar] until approximately June, 1991," and that Dean, King and Northstar "breached the agreements and breached their fiduciary duty to me and to GNG and forced us out of the joint venture in approximately June, 1991."

Obviously, the statements made in the affidavits as to when the relationship between the parties was terminated were conflicting, and neither statement has controlling effect over the other in a summary judgment proceeding. Since the opposing affidavits involved the credibility of the affiants as to when the causes of action arose, the motion for summary judgment was not grantable, *Great American R. Ins. Co. v. San Antonio .Pl. Sup. Co.,* 391 S.W.2d 41, 47 (Tex.1965), on the ground of limitations, which was merely a fact issue presented by the opposing affidavits for the trier of fact. *Coe v. Koltz,* 300 S.W.2d 300, 303 (Tex.Civ.App.—Dallas 1957, no writ). GNG and Gouge's seventh point of error is sustained.

Accordingly, the judgment is reversed and the cause is remanded to the trial court.