IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-40965
_____


JARVIS CHRISTIAN COLLEGE,

                    Plaintiff-Appellant,

-vs-


NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PENNSYLVANIA,

                    Defendant-Appellee.

_____

          Appeal from the United States District Court
              for the Eastern District of Texas
_____

                    December 3, 1999

Before POLITZ and STEWART, Circuit Judges, and LITTLE,
District Judge.[*]


LITTLE, District Judge:

     Plaintiff Jarvis Christian College ("Jarvis") appeals the
district court's ruling declaring that Jarvis is not entitled
to recover indemnity for the loss caused by the actions of
Jerrell J. Cosby, pursuant to the "School Leaders Errors and
Omissions" Policy, issued by defendant National Union Fire
Insurance Company of Pittsburgh, Pennsylvania ("National

_____
[*] District Judge of the Western District of Louisiana, sitting by designation.

Union"). Jarvis argues that the district court made erroneous findings of fact and conclusions of law regarding two of the Policy's exclusions: (1) the "personal profit or advantage" exclusion, and (2) the "fraud or dishonesty" exclusion. Moreover, Jarvis argues that the district court erred in not awarding penalties and interest to Jarvis and in denying Jarvis' claim for attorney's fees. We AFFIRM the district court's ruling.

## I. BACKGROUND

### A. Facts of the Case

Jarvis is a community college in Wood County, Texas, operating as a Texas non-profit corporation. Jarvis is an insured under a "School Leaders Errors and Omissions" Policy ("Policy") issued by National Union, which is authorized and licensed to do business in the State of Texas. The Policy, with a liability limit totaling $1 million, insured against claims arising from "wrongful acts" committed by directors and officers of the school.

Jerrell J. Cosby ("Cosby") was a member of Jarvis' board of trustees, as well as Jarvis' treasurer and chairman of the finance committee. During his tenure, Cosby issued a proposal to the finance committee and later the board of trustees about an investment opportunity in a small factoring[1] company called

---

[1] Factoring is the business of accepting accounts receivable as security for short-term loans. See WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 460 (1988).

2

Action Funding, Inc. ("Action Funding"). Action Funding was a relatively new and undercapitalized business with very little experience in factoring. At the time, it even reported a negative net worth on its tax return. Cosby had a 49% ownership interest in, and was a director and salaried employee of, Action Funding. Apparently, however, he did not disclose that information to Jarvis' finance committee and board of trustees,[2] and the committee and board were not aware of such facts.

After a presentation to the finance committee by Cosby's Action Funding business partner, Rodney Williams, it was Cosby's recommendation that Jarvis invest $2 million of its endowment funds in the venture. It is noted that $2 million represent nearly the entire 15% of Jarvis' endowment funds that had been reserved for "nontraditional" investments. Ultimately, Cosby successfully caused the transfer of $2 million of Jarvis' endowment funds to Action Funding. In exchange, Action Funding gave Jarvis a piece of paper that amounted to no more than an unsecured promissory note.

Perhaps unsurprisingly, the investment failed. With the money from Jarvis, Action Funding had bought accounts receivable from hospitals and health care providers at a discounted rate, with plans to collect the debts at face value

---

[2] Cosby testified that he had informed the board of his ownership interest and expected profits, but Jarvis fully disagreed with that contention. According to the testimony of Jarvis representatives, Cosby never disclosed his involvement with Action Funding and his conflicts of interest arising therefrom. As a matter of fact, the board minutes do not reflect that such a disclosure was made until September 1992, when Jarvis' executive committee became aware of Action Funding's financial difficulties.

at a later time. The hospitals and health care providers went into bankruptcy, however, and Action Funding was unable to collect the debts. Action Funding failed to fulfill its promissory note obligation to Jarvis and ceased doing business altogether in 1991. In September 1992, Jarvis' executive committee first learned of Action Funding's financial troubles and the exact nature of Cosby's involvement with Action Funding. In light of Cosby's status as co-owner, director, and employee of Action Funding, Cosby was asked to resign from Jarvis' board, which he eventually did.

On 15 March 1993, Jarvis filed a lawsuit ("underlying lawsuit") against Cosby and Action Funding in the 294th Judicial District Court for Wood County, Texas.[3] In its original petition, Jarvis alleged that Cosby had misrepresented certain facts and had made false statements to the board of trustees in connection with the $2 million transfer. Jarvis timely presented its claim for payment to National Union for the financial loss arising out of the acts committed by Cosby as alleged in the petition.

The jury found that Cosby breached both the duty of care and the duty of loyalty that he owed to Jarvis. Based upon the jury's verdict, a final judgment was signed by the state court on 12 September 1995, awarding Jarvis judgment against Cosby in the amount of $1,815,000 (of which $315,000 was

---

[3] That lawsuit is styled Jarvis Christian College, Inc. v. Jerrell J. Cosby and Action Funding, Inc., No. 93-141.

prejudgment interest) and against Action Funding in the amount of $2,015,000 (of which $15,000 was attorney's fees). Jarvis never received any payments on the judgment from either Cosby or Action Funding.

Seeking to collect money from its School Leaders Errors and Omissions Policy based upon the judgment in the underlying lawsuit, on 28 March 1996, Jarvis made a written demand to National Union to pay the policy limits. After evaluation of the claim, National Union denied it in writing on 11 October 1996. The reasons given were that the loss was not covered under the Policy by definition of "wrongful act" as set forth in the contract, and that two of the policy exclusions--the "fraud or dishonesty" exclusion and the "personal profit or advantage" exclusion--were applicable in this case to preclude coverage.

## B. Procedural History

On 3 February 1997, Jarvis filed this lawsuit against National Union in the 294th Judicial District Court of Wood County, Texas, seeking a declaratory judgment as to coverage under the Policy. National Union removed the action to the United States District Court for the Eastern District of Texas based upon diversity of citizenship and amount in controversy in excess of $75,000. Both parties filed motions for summary judgment on the coverage issues.

5

The parties stipulated that they would waive trial by jury, and the case was tried before the district court on 15 January 1998. The record from the proceedings in the underlying lawsuit was introduced into evidence by agreement of the parties. Both parties' motions for summary judgment were denied.

On 16 July 1998, the district court entered its findings of fact and conclusions of law. The court found that the language in the Policy's definition of "wrongful act" is ambiguous and must be construed in favor of Jarvis, the insured, pursuant to Texas law. The court also found, however, that two policy exclusions--the fraud or dishonesty exclusion and the personal profit or advantage exclusion--are applicable to Jarvis' claim, either of which precludes insurance coverage in this case. The court concluded that Jarvis is not entitled to recover under the School Leaders Errors and Omissions Policy issued by National Union for the loss caused by Cosby's actions. Having concluded that Jarvis' claim was properly denied by National Union, the court awarded no penalties, prejudgment interest, or attorney's fees to Jarvis.

Based upon its findings and conclusions, the district court entered a final judgment in favor of National Union. Jarvis filed a notice of appeal on 3 August 1998.

## II.  DISCUSSION

## A.  Standard of Review

A federal court of appeals reviews a judgment on the merits of a nonjury civil case applying the usual standards of review.  See North Alamo Water Supply Corp. v. City of San Juan, Tex., 90 F.3d 910, 914-15 (5th Cir. 1996).  Thus, with respect to the district court's underlying fact-findings and inferences deduced therefrom, the appellate court is bound by the "clearly erroneous"[4] standard of review.  See Barrett v. United States, 51 F.3d 475, 478 (5th Cir. 1995); see also Fed. R. Civ. P. 52(a)("[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous").  The legal conclusions reached by the district court based upon factual data are reviewed de novo, as an issue of law.  See Barrett, 51 F.3d at 478.  If the district court's account of the evidence is plausible in light of the record viewed as a whole, the appellate court may not reverse even if it is convinced that, had it been sitting as the trier

---

[4] In Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 105 S.Ct. 1504 (1985), the Supreme Court discussed at length the meaning of "clearly erroneous."  It stated that "'[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  Id. at 573, 105 S.Ct. at 1511 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542 (1948)).  The Court elaborated:

> This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.  The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. . . .  If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. . . .  This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

Id. at 573-74, 105 S.Ct. at 1511-12 (citations omitted)(emphasis added).

of fact, it would have weighed the evidence differently. <u>See</u> <u>North Alamo</u>, 90 F.3d at 915. "In practice, the 'clearly erroneous' standard requires the appellate court to uphold any district court determination that falls within a broad range of permissible conclusions." <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 400, 110 S.Ct. 2447, 2458 (1990).

## B. Rules of Interpretation

The district court's interpretation of an insurance contract and its exclusions is a question of law and, thus, subject to de novo review. <u>See</u> <u>Lubbock County Hosp. Dist. v. National Union Fire Ins. Co.</u>, 143 F.3d 239, 241-42 (5th Cir. 1998).

In this diversity case, Texas rules of contract interpretation govern. <u>See</u> <u>Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co.</u>, 99 F.3d 695, 700 (5th Cir. 1996); <u>see also</u> TEX. INS. CODE ANN. art. 21.42 (West 1999). Under Texas law, the terms used in an insurance policy are to be given their ordinary and generally accepted meaning, unless there is an indication that the words were meant in a technical or different sense. <u>Canutillo</u>, 99 F.3d at 700 (citing <u>Security Mut. Cas. Co. v. Johnson</u>, 584 S.W.2d 703, 704 (Tex. 1979). The policy is to be considered as a whole, with each part given effect and meaning. <u>See</u> <u>id.</u> (citing <u>Forbau v. Aetna Life Ins. Co.</u>, 876 S.W.2d 132, 133 (Tex. 1994).

It is well established under Texas law that ambiguities in insurance contracts are to be strictly construed against the insurer. See Sharp v. State Farm Fire and Cas. Ins. Co., 115 F.3d 1258, 1260-61 (5th Cir. 1997)(citing Puckett v. U.S. Fire Ins. Co., 678 S.W.2d 936, 938 (Tex. 1984)). This is "'especially so when dealing with exceptions and words of limitation.'" Lubbock County, 143 F.3d at 242 (quoting Ramsay v. Maryland Am. Gen. Ins. Co., 533 S.W.2d 344, 349 (Tex. 1976)). If a policy clause is ambiguous, the court must adopt the insured's construction of the clause, "'as long as that construction is not unreasonable, even if the construction urged by the insurer appears more reasonable or a more accurate reflection of the parties' intent.'" Id. (quoting National Union Fire Ins. Co. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991)).

These rules favoring the insured apply only if the contract is determined to be ambiguous. See Sharp, 115 F.3d at 1261. Whether the contract is ambiguous is a question of law for the court to decide. See id. The fact that the parties disagree as to coverage does not create an ambiguity. See id. The court looks first to the language of the policy itself. See id. If the policy clause is susceptible of only one reasonable interpretation, the court must enforce the clause as written, see Lubbock County, 143 F.3d at 242, even if disfavorable to the insured.

## C. "Personal Profit or Advantage"

The School Leaders Errors and Omissions Policy issued by National Union to Jarvis contains a policy exclusion as to "any claim arising out of[5] the gaining in fact of any personal profit or advantage to which the Insured is not legally entitled."[6]  The district court found that "[i]n completing the transfer of the $2,000,000 of the plaintiff's funds to Action Funding, Inc., Cosby gained, in fact, a personal profit or advantage." (R. 582, Finding of Fact No. 10).  To support its finding, the court below articulated:

> Despite the plaintiff's contention that Cosby obtained no _profit_ as a result of the $2 million transfer, it seems self-evident that Cosby's actions provided him, ultimately, with a distinct business _advantage_.  It cannot be disputed that the investment of $2 million dollars into the coffers of Action Funding accrued to Cosby's personal advantage by infusing his business with substantial investment capital with which to operate his business.  As a factoring business, such capital would enable Action Funding to acquire from other businesses the accounts receivable necessary for it to operate and ultimately profit.  The record in the underlying case makes clear, and Cosby himself admitted, that he maintained a forty-nine percent interest in Action Funding, Inc.  As an owner of Action Funding, Cosby stood to gain, personally, from any investment of capital into his business.  It [is] clear then, that Cosby gained, in fact, an advantage from the transfer of the $2 million to Action Funding, Inc.

(R. 597)(emphasis in original)(citation omitted).

---

[5] The words "arising out of," when used within an insurance policy, are "'broad, general, and comprehensive terms effecting broad coverage.'  The words are understood to mean 'originating from,' 'having its origin in,' 'growing out of or 'flowing from.'" American States Ins. Co. v. Bailey, 133 F.3d 363, 370 (5th Cir. 1998)(quoting Red Ball Motor Freight, Inc. v. Employers Mut. Liab. Ins. Co., 189 F.2d 374, 378 (5th Cir. 1951)).

[6] This language appears in the "Exclusions" section of the policy as Exclusion (f).

10

The district court's finding that Cosby actually gained a personal profit or advantage from the $2 million transfer is not clearly erroneous. First, any time money was loaned to Action Funding, it worked to Cosby's personal advantage, from a business perspective, as he was a 49% owner of Action Funding. Capital investmests would allow the small factoring company to grow and prosper, and also to gain credibility with other companies--companies with which Action Funding could transact business. Consequently, Cosby would become the owner of a successful business. Business success clearly qualifies as a personal advantage.

Importantly, Cosby was not personally responsible for the loan repayment. As a 49% owner, Cosby stood to reap the financial benefits from profitable investmests, without personal responsibility for borrowed funds.

In this case, Cosby breached his fiduciary duties to Jarvis, as the jury in the underlying lawsuit found, and wrongfully gave <u>himself</u> the personal advantage in transferring $2 million of Jarvis' money to a small, highly risky business. One must ask why <u>any</u> corporate officer/trustee would violate his fiduciary duties by transferring a substantial sum of corporate funds to another company--one that he owns--if the transfer was not going to give him a personal advantage.

Second, Action Funding was operating at a loss prior to the $2 million transfer. As previously mentioned, it reported

11

a negative net worth on its tax return. By infusing funds into his undercapitalized business, Cosby created a viable opportunity for his business, and therefore himself as well, to make a profit.

It also may be noted that by not disclosing to the others at Jarvis his ownership interest in and employee status with Action Funding, Cosby placed himself at a personal advantage. Had he disclosed such information, Cosby very well may not have been able to accomplish what he hoped to do, namely to transfer Jarvis' $2 million to Action Funding. Had Cosby disclosed, the investment opportunity that was to his distinct advantage would have been lost. Therefore, by not revealing his connection with Action Funding to the Jarvis board and finance committee, Cosby placed himself, and Action Funding, at an advantage.

One of Jarvis' central arguments in its appellate brief is that Cosby did not gain "in fact" a personal profit or advantage, as set forth in the language of the policy exclusion at issue. It is Jarvis' contention that Cosby's only "benefit" received in connection with Action Funding was a monthly salary of $6,000 for a period of sixteen months as a director of Action Funding. Jarvis defends that such a salary does not constitute "profit." While Jarvis' argument takes account of Cosby's employee status with Action Funding, it fails to acknowledge the fact that Cosby was also an owner

12

of Action Funding.  Employees may not share in profits, if any, but owners certainly do.  And it is clear from the records that from the $2 million investment, Cosby expected to make over $360,000 personally as an Action Funding owner and director.  Unrealistic or not, his expectations fueled his objective to transfer $2 million of Jarvis' endowment funds to Action Funding.

Even if it were conceded that Cosby did not gain "in fact" a personal profit, the policy exclusion at issue contains a second exclusionary term:  "advantage."  Although Cosby may not have gained a balance-sheet profit, Cosby did gain in fact a personal advantage, as the district court correctly concluded and as discussed in the above paragraphs.

Jarvis accuses the district court of impermissibly compounding inferences in arriving at the conclusion that Cosby gained a personal advantage from the $2 million transfer.  The alleged inferences are: "(1) Jarvis' investment in Action Funding 'would enable Action Funding to acquire . . . accounts receivable necessary for it to operate and ultimately profit'; and (2) 'Cosby stood to gain, personally[,] from any investment of capital into his business.'"  (Pl.'s Br. at 37).  Then Jarvis quickly points out that Action Funding operated at a loss rather than a profit and that regardless of what Cosby stood to gain, he

13

received only a salary and in fact lost all the money he personally had invested in Action Funding.

Jarvis would have this Court believe that in order to gain an advantage in fact, one necessarily has to make some sort of tangible profit. Such a construction is unreasonable, for it would render the advantage prong of "personal profit or advantage" meaningless and superfluous. As National Union suggests, the term "advantage" is broader than the term "profit."[7] The former does not mean a balance-sheet profit; rather, it encompasses any gain or benefit, such as an <u>opportunity</u> to make a profit but without responsibility to repay the loan.

Furthermore, the district court found that "Cosby was not legally entitled to a personal profit or advantage from the $2,000,000 transfer because, in transferring these funds, Cosby breached his duty of loyalty to the plaintiff." (R. 583, Finding of Fact No. 19). The lower court's reasoning was that "the jury found, and the record affirms, that the transfer of funds from Jarvis' endowment to Action Funding came about through Cosby's breach of duty of loyalty." (R. 597). The court then cited <u>GNG Gas Systems, Inc. v. Dean</u>, 921 S.W.2d 421 (Tex.App.--Amarillo 1996), for the proposition that

---

[7] "Advantage" is defined as: **1.**A factor conducive to success. **2.**Profit or benefit: GAIN. **3.** A relatively favorable position. . . . WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 81 (1988)(emphasis in original). By contrast, "profit" is defined as: **1.** An advantageous gain or return: BENEFIT. **2.** The return received on a business undertaking after meeting all operating expenses. **3.** *often* **profits**. **a.** The return received on an investment after paying all charges. **b.** The rate of increase in the net worth of a business enterprise during a given accounting period. **c.**Income received from investments or property. **d.** The amount received for a commodity or service above the original cost. Id. at 939 (emphasis in original). Thus, even if to Jarvis' advantage we were to choose the narrowest definition of each term, the term "advantage" is still more expansive in meaning than "profit."

14

when a corporate officer or director diverts assets of the corporation to his own use, he breaches a fiduciary duty of loyalty to the corporation, and the transaction is presumptively fraudulent and void as being against public policy. See id. at 427. On that basis, the court concluded that Cosby clearly was not legally entitled to the funds which his business received as a result of a fraudulent transaction. (R. 597).

The district court's finding that Cosby was not legally entitled to a personal profit or advantage from the $2 million transfer is not clearly erroneous. In fact, it is wholly consistent with Texas law. In Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509 (Tex. 1942), the Supreme Court of Texas announced that "if [a] fiduciary 'takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.'" Id. at 574, 160 S.W.2d at 514 (quoting United States v. Carter, 217 U.S. 286, 306, 30 S.Ct. 515, 520 (1910)). This indicates that a fiduciary is not legally entitled to any profit or advantage he gains as a result of a breach of duty or trust.

Jarvis contends that the district court's finding "is premised on the erroneous view that a breach of the duty of

15

loyalty is an illegal act. . . ." (Pl.'s Br. at 39). Jarvis then proceeds by arguing that Cosby's actions were not per se illegal under Texas law. While the district court found that Cosby is <u>not legally entitled</u> to a personal profit or advantage, it never decided that Cosby's breach of the duty of loyalty is an <u>illegal</u> act.

"Not legally entitled" simply is not synonymous with "illegal." The two have quite different meanings, with "illegal" involving a greater degree of misconduct.[8] Jarvis misconstrues the language of the district court's finding and asserts that Cosby's breach of his fiduciary duties was not tantamount to illegality. The policy exclusion clearly states that it precludes coverage for "any personal profit or advantage to which the Insured is <u>not legally entitled</u>" (emphasis added).

Jarvis criticizes the definition of the duty of loyalty provided to the jury in the underlying state court action. The duty of loyalty was defined in the jury charge to mean that "the director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation." Jarvis disputes the conjunctive word "and," arguing that "[the] elements are conjunctive. . . . The

---

[8] National Union provides a good illustration of the distinction in its brief:

> For example, a bank customer who receives an erroneous credit on his monthly statement is not "legally entitled" to keep the mistaken deposit, since the bank or another customer has a superior right to that money; however, that customer is not guilty of illegal or illicit activity.

(Def.'s Br. at 27).

16

district court has therefore in effect held that Cosby's failure to act in good faith is sufficient proof of illegality to preclude coverage." (Pl.'s Br. at 43).

As discussed earlier, the district court made no mention, let alone a finding, of illegality in this case. Jarvis' criticism of the jury charge is without merit. As this Court stated in Gearhart Industries, Inc. v. Smith Intern., Inc., 741 F.2d 707 (5th Cir. 1984), "[t]he duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation." Id. at 719. The definition in the jury charge, which is essentially verbatim, was not erroneous.

Finally, pointing out that the policy insures against wrongful acts, which are defined as "any actual or alleged breach of duty . . . ," Jarvis then makes a twisted argument. Jarvis argues: (1) insurance contracts should be construed to provide meaning to all terms, including the word "any" in the above clause; (2) that term "any" conflicts with the policy exclusion at issue; (3) under Texas law, if a policy contains conflicting provisions, the insuring clause takes precedence over a conflicting exclusionary clause.

The frailty of that argument is obvious. Jarvis' construction of the policy and the word "any" in the insuring clause would render the policy exclusion at issue completely meaningless. In fact, any exclusionary provision would be

17

devoid of meaning or value. There would be no reason for having an "Exclusions" section in any insurance contract. Interestingly, that would violate the very same rule that Jarvis invokes: insurance contracts should be construed to provide meaning to all terms.

For all of the foregoing reasons, the district court's findings with respect to the "personal profit or advantage" exclusion are not clearly erroneous, and Jarvis' arguments to the contrary are unpersuasive.

## D. "Fraud or Dishonesty"

The policy issued by National Union to Jarvis contains another applicable policy exclusion. The exclusion defeats "any claim involving allegations of fraud, dishonesty or criminal acts or omissions; however, the Insured shall be reimbursed for all amounts which would have been collectible under this policy if such allegations are not subsequently proven."[9] The district court found that this "fraud or dishonesty" exclusion applies to this case and precludes coverage of Jarvis' claim.

We need not engage in a discussion of the fraud or dishonesty exclusion here, as the personal profit or advantage exclusion applies and fully precludes coverage in this case.

## E. "Wrongful Act"

---

[9] This language appears in the "Exclusions" section of the policy as Exclusion (a).

18

The School Leaders Errors and Omissions Policy issued by National Union to Jarvis insures against claims for any "wrongful act" committed by directors and officers of Jarvis. "Wrongful act" is specifically defined in the policy as follows: "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement or omission committed solely in the performance of duties for the School District . . . ."

A dispute at trial before the district court centered on the phrase "solely in the performance of duties for the School District." National Union interpreted the phrase to mean "when an insured has no interest in a transaction other than that of the School District." Such interpretation would exclude coverage from the outset for the wrongful acts of directors and officers "wearing two hats" or having "divided loyalties," such as Cosby had as a director of both Jarvis and Action Funding. Jarvis offered a different interpretation of the same phrase: "while performing duties for the School District." Jarvis' claim arising from Cosby's actions initially would fall within coverage under this second interpretation.

The district court found that the phrase "solely in the performance of duties for the School District" in the insuring clause is ambiguous and susceptible to more than one reasonable interpretation. Recognizing that Texas law compels

19

the court to construe ambiguities in favor of the insured regardless of which interpretation is more reasonable, the district court adopted the interpretation offered by Jarvis.

National Union contends that the district court erred in finding the phrase ambiguous. According to National Union, there is no ambiguity; "[b]ased upon the express terms of this provision, a covered act must be one that was done 'solely' on behalf of Jarvis." (Def.'s Br. at 43). Because Cosby clearly had divided loyalties between Jarvis and Action Funding, National Union's argument is that when Cosby made the $2 million transfer, he was not acting "solely in the performance of duties" for Jarvis.

The district court's finding that the phrase at issue is ambiguous is not clearly erroneous. Jarvis presented to the district court an interpretation that is reasonable and different from the one provided by National Union, which also is reasonable. Under Texas law, a contract is ambiguous if it is reasonably susceptible of two different meanings. See Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co., 99 F.3d 695, 700 (5th Cir. 1996)(citing Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)). If a policy provision is ambiguous, the court must adopt the insured's construction of the provision, as long as that construction is not unreasonable, even if the construction urged by the insurer appears more reasonable or a more accurate reflection of the

20

parties' intent.  See Lubbock County Hosp. Dist. v. National Union Fire Ins. Co., 143 F.3d 239, 242 (5th Cir. 1998)(citing National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991)).  Thus, the district court was correct in construing the ambiguity in favor of Jarvis, the insured.

Contrary to National Union's position that, due to divided loyalties, Cosby could not have acted "solely in the performance of duties for the School District" when he caused the $2 million transfer, a fair argument can be made that it is because Cosby was acting solely in the performance of his duties as Jarvis' treasurer that he was able to accomplish what he did.  Cosby may very well have been the only person at Jarvis authorized to invest that kind of money in another business.  Regardless of motive or intention, Cosby's job as treasurer was to manage and make investments with Jarvis' money, and that is what he did in this case.

Because the definition of "wrongful act" contains a phrase for which there is no one clear reading, the district court did not clearly err in finding an ambiguity and construing it in favor of the insured, under Texas law.

**F.  Penalties, Interest, and Attorney's Fees**

Based on our discussion, Jarvis is not entitled to a favorable ruling on any of the issues presented.  Because the "personal profit or advantage" exclusion precludes coverage of

21

Jarvis' claim in this case, the district court was correct in not awarding penalties and interest to Jarvis.

Jarvis also is not entitled to attorney's fees incurred in prosecuting its claim against National Union. Because it was proper for National Union to deny Jarvis' claim, the district court did not err in declining to grant Jarvis attorney's fees in this case. There is no issue remaining as to attorney's fees to remand to the district court.

### III. CONCLUSION

The district court's finding that Cosby gained in fact a personal profit or advantage when he caused the transfer of $2 million of Jarvis' endowment funds to a company in which he was a 49% owner--all without disclosing his conflicts of interest to Jarvis--is not clearly erroneous. Cosby gained measurable personal advantages from a financial and business perspective, including continuation of a steady monthly salary and the opportunity to make a handsome profit. The district court properly concluded that Jarvis' claims against Cosby were excluded from the coverage of the National Union policy by virtue of the "personal profit or advantage" exclusion. Because such exclusion applies, applicability of the "fraud or dishonesty" exclusion is unnecessary and need not be considered in this case.

The district court's finding that there is not one clear reading of the policy language "solely in the

22

performance of duties for the School District" is not clearly erroneous, since the phrase is susceptible to more than one reasonable interpretation.  The court's finding in favor of the insured, that Cosby's conduct constituted a "wrongful act" within the scope of the policy's coverage, is also not clearly erroneous.

Finally, since Jarvis is not entitled to a favorable ruling on any of the issues, the district court did not err in denying Jarvis penalties and interest, as well as attorney's fees.  We AFFIRM the judgment of the district court in all respects.

AFFIRMED