Revised February 12, 2003

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-10768
Summary Calendar
_____

FEDERAL INSURANCE CO.,

Plaintiff-Appellee,

versus

COMPUSA, INC. and JAMES F. HALPIN,

Defendants-Appellants.

--------------------
Appeals from the United States District Court
for the Northern District of Texas
--------------------
February 11, 2003

Before DAVIS, WIENER, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

Defendants-Appellants CompUSA, Inc. ("CompUSA") and its former president and CEO, James F. Halpin ("Halpin"), appeal from the district court's grant of summary judgment in favor of Plaintiff-Appellee Federal Insurance Company ("Federal"), declaring that Federal is not obligated under its Executive Protection Policy No. 8146-12-81B ("Policy") to indemnify CompUSA or Halpin for any claims arising from the state court lawsuit brought against them by COC Services, Ltd. ("COC") early in 2000. For the same reasons

expressed by the district court in its Memorandum Opinion and Order of June 4, 2002, we affirm.

## I. Facts and Proceedings

Federal issued the Policy to CompUSA, insuring it and its officers and directors against specified legal liabilities, for an initial term of two years, beginning December 16, 1998 and ending December 16, 2000. The Policy covered "claims made" during that two-year policy period, and contained a provision allowing CompUSA to extend the "reporting period" (but not the coverage period) for any claims made within one year following the effective date of termination of the Policy, but only as to claims based on acts committed during the policy term, i.e., prior to the effective date of termination of the Policy.

On January 3, 2000, just a little more than halfway through the two-year term of the Policy, COC filed a suit in state court against CompUSA. Approximately one month later, COC amended its complaint to add Halpin and other individuals as defendants.

CompUSA evaluated the claims advanced by COC and judged them to be frivolous. On the basis of that evaluation, CompUSA made the conscious decision not to furnish written notice of COC's claims to Federal even though the claims were made during the term of the Policy. This election was made despite, and in full knowledge of, the following provision of the Policy:

2

> The **Insureds** shall, <u>as a condition precedent</u> to exercising their rights under this coverage section, <u>give to [Federal] written notice as soon as practicable</u> of any **Claim** made against any of them for a **Wrongful Act** (emphasis added).

Indeed, without apprising Federal of the claims or of the lawsuit and its progress, CompUSA and the other defendants in COC's state court suit handled that matter entirely on their own, from the time the suit was filed in January, 2000 until the three-week jury trial ended on February 8, 2001, with a multimillion dollar verdict in favor of COC. In fact, it was not until a week <u>after</u> the jury returned its verdict that CompUSA made an abrupt change of its long-standing "no notice" position and purported to comply with the Policy's notice requirement by sending a letter via Federal Express on February 15, 2001, which was received by Federal on February 16, 2001.[1]

Although the record reflects that Federal had no actual knowledge of COC's claims or of the state court lawsuit, there is evidence that an employee in Federal's underwriting department (<u>not</u> in its claims department) acquired, via the Internet, a copy of CompUSA's 54-page quarterly 10-Q report for the period ending December 25, 1999. This copy of CompUSA's 10-Q was obtained in

---

[1] CompUSA's evaluation of COC's claims as unmeritorious appears to have been shared by the state trial court, at least as to the liability of CompUSA and Halpin. The trial judge granted their motions for judgment n.o.v., reversing the jury and ordering that COC take nothing from CompUSA and Halpin. COC's appeal of that ruling is currently pending.

February, 2000, in connection with the anticipated March 1, 2000 early termination of the Policy.  Early termination of the Policy was occasioned by CompUSA's being acquired by another organization. In turn, the anticipated termination of the Policy is apparently what prompted CompUSA to apply for and eventually obtain a six-year extension of the period in which claims relating to the pre-termination policy period could be made, in lieu of the one-year extension of the reporting period, to which CompUSA was entitled under the Policy.[2]  CompUSA's 10-Q, it later turned out, contained a reference to, <u>inter alia</u>, the COC claim  Uncontradicted record testimony reflects, however, that no one at Federal was aware of the reference to the COC claim in CompUSA's 10-Q, or had even read that part of the 10-Q, until a time in 2001 <u>after</u> CompUSA and Halpin were cast in judgment and <u>after</u> Federal filed the instant declaratory judgment action.

The district court granted Federal's motion for summary judgment in June, 2002, declaring that, as to the claims advanced in COC's suit, the failure of CompUSA and Halpin to furnish notice to Federal "as soon as practicable" eliminated any indemnity

---

[2] We speculate that CompUSA's decision not to furnish notice to Federal when COC's claims were made, and instead to assume sole responsibility for the claims, was influenced, if not directly caused, by the fact that CompUSA, in full awareness of its impending acquisition and the impending early termination of the policy, was negotiating for the six-year reporting-period extension at the same time, and likely viewed the COC claims as a potential fly in the ointment.  Some things are too much of a coincident to be a coincident.

obligation of the insurer under the Policy.  CompUSA and Halpin timely filed a notice of appeal.

## II. Analysis

A.    Standard of Review

As this case is before us on appeal from the district court's grant of summary judgment, our review is plenary.

B.    Bases of CompUSA's and Halpin's Appeals

CompUSA and Halpin do not — because they cannot (at least not with a straight face) — contend that the letter sent to Federal on February 15, 2001 (more than a year after the lawsuit was filed, about a year after Halpin was impleaded, and a week after the jury returned a $90 million verdict for COC against four individual defendants, including Halpin) satisfied the Policy's condition precedent of furnishing written notice "as soon as practicable" following the making of a claim.  Instead, in this post-hoc attempt to avoid the adverse results of the risk they had assumed more than a year earlier when they decided not to furnish notice timely to Federal and instead to handle the COC claims on their own, CompUSA and Halpin advance alternative theories for why their failure to satisfy that condition precedent does not preclude their recovering from Federal under the Policy:  (1) Extending the reporting period beyond a "claims-made" policy's termination date somehow converts such a policy to an "occurrence" policy, thereby relieving the insureds of strict, timely notice compliance and forcing the

5

insurer to demonstrate that actual prejudice resulted from tardy notification by the insureds; and (2) the Policy's formal notice requirement was somehow satisfied when a member of Federal's underwriting staff acquired a copy of CompUSA's 10-Q, which was later found to contain a description of COC's claims. Halpin asserts an additional theory, contending that, despite having been CompUSA's President and CEO at the time, he was somehow prohibited by the terms of the Policy from furnishing notice to Federal of COC's claims against him.

On the spectrum of disingenuous theories of defense, we view those advanced by CompUSA and Halpin as lying somewhere between wholly specious and downright frivolous. In contrast, we view the clear and comprehensive opinion of the district court as more than adequately explaining and supporting its grant of summary judgment in favor of Federal. In the interest of judicial economy, therefore, we shall not replicate the district court's cogent disposition of this matter by writing separately. Instead, we adopt that court's aforesaid Memorandum Opinion and Order in its entirety, incorporating it herein by reference and appending a copy for publication with this opinion.

AFFIRMED.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

FEDERAL INSURANCE COMPANY, §

§

Plaintiff, §

§  Civil Action No. 3:01-CV-0593-D

VS. §

§

COMPUSA, INC., et al., §

§

Defendants. §

MEMORANDUM OPINION

AND ORDER

The court must decide in this declaratory judgment action involving a claims-made policy whether the insureds' failure to comply with a condition precedent that they give the insurer written notice of their claim "as soon as practicable" precludes any right to indemnity arising from a county court lawsuit. The court holds that the insureds failed to give such notice, that any actual notice that the insurer had of the claim is immaterial, and that the insurer is not required to show that the lack of the contractually-required notice caused it prejudice. The court therefore grants summary judgment

in favor of the insurer and declares that it is not obligated to indemnify the insureds in connection with the claim at issue.

I

Plaintiff Federal Insurance Company ("Federal") issued an Executive Protection Policy ("the Policy") to defendant CompUSA, Inc. ("CompUSA") that insured its directors and officers, including James F. Halpin ("Halpin"), CompUSA's President and Chief Executive Officer (CompUSA and Halpin are referred to collectively as the "Insureds"). The Policy covered the period December 16, 1998 through December 16, 2000. When CompUSA was acquired, the Policy was terminated effective March 1, 2000. CompUSA paid Federal an additional premium in exchange for a six-year extended reporting period.

In January 2000 COC Services, Ltd. ("COC") sued CompUSA in county court ("the COC suit") alleging *inter alia* that it had breached an agreement to form a joint venture to expand CompUSA's personal computer business into Mexico. In February 2000 COC filed an amended petition that added Halpin as a defendant and alleged claims against him for fraud, tortious interference, conspiracy, and unjust enrichment. Halpin and CompUSA jointly answered in March 2000. COC again amended its petition in July 2000.

At least CompUSA viewed the lawsuit as frivolous, believed it would be dismissed as a matter of law, and decided to defend itself without formally notifying Federal. The jury, however, did not assess COC's claims with the same incredulity. Following a trial of several weeks, the jury returned a verdict in favor of COC on February 8, 2001, awarding it $90 million against Halpin and three other defendants (assessing 65% of the damages against Halpin) for intentional interference with an existing contract and awarding COC $175.5 million against Halpin in exemplary damages. Six days later—11

months after COC effected service of process—Mark Walker, Esquire ("Walker"), CompUSA's Executive Vice President and General Counsel, notified Federal by February 14, 2001 letter of the COC suit and the verdict. The evidence is undisputed that this letter is the first formal notice that Federal received from CompUSA or Halpin concerning the suit. Walker stated in his letter that CompUSA and Halpin were providing notice of the claim and potential loss to Federal and requesting that it acknowledge notice and confirm coverage under the Policy. The county court later resolved the COC suit favorably to CompUSA and Halpin, ruling that COC would recover nothing from them. The county court judgment is now on appeal.

In the instant action, Federal asks the court to declare that it is not obligated to indemnify the Insureds for any loss arising from the COC suit because *inter alia* they failed to satisfy the condition precedent that they provide Federal with written notice of the claim "as soon as practicable," as required by the Policy. Federal maintains that the lack of timely notice prejudiced it in its investigation, defense, and potential settlement of the COC suit. It now moves for summary judgment seeking entry of a declaratory judgment.

CompUSA opposes Federal's motion. It concedes that, with hindsight, it should have provided earlier formal notice of the claim. CompUSA maintains, however, that it did not notify Federal, and it defended the COC suit at its own expense, because it viewed the case as frivolous and believed it would be dismissed as a matter of law. CompUSA argues that Federal is not entitled to summary judgment because there is a genuine issue of material fact whether on February 23, 2000—22 days after Halpin was served with the lawsuit—Federal received actual notice of the COC suit in another form: via CompUSA's January 21, 2000 Securities and Exchange Commission Form 10-Q. It argues that, under Texas law, actual notice is sufficient. CompUSA also asserts that Federal

must prove that it suffered actual prejudice due to the late notice and that it has not done so, or that there is a genuine issue of material fact whether it has been prejudiced. It contends that the Policy was converted from a claims-made policy to an occurrence policy, which requires a showing of prejudice.

Halpin also opposes Federal's motion. He does so on grounds similar to the ones CompUSA advances—that there are fact issues whether Federal received actual knowledge of the COC suit via the Form 10-Q and whether it suffered prejudice due to the late notice. He also advances the independent contention that he was expressly prohibited under the Policy from giving Federal notice of the claim.

II

Insuring clause 1 of the Policy states:

> The Company shall pay on behalf of each of the Insured Persons all Loss for which the Insured Person is not indemnified by the Insured Organization and which the Insured Person becomes legally obligated to pay on account of any Claim first made against him, individually or otherwise, during the Policy Period or, if exercised, during the Extended Reporting Period, for a Wrongful Act committed, attempted, or allegedly committed or attempted by such Insured Person before or during the Policy Period.

P. App. 14 (emphasis deleted). Insuring clause 2 provides coverage for similar "Loss for which the Insured Organization grants indemnification to each Insured Person." *Id.* (emphasis deleted). Of significance to the instant case, the Policy also contains a "Reporting and Notice" clause that states, in pertinent part:

> The Insureds shall, as a condition precedent to exercising their rights under this coverage section, give to the Company written notice as soon as practicable of any Claim made against any of them for a Wrongful Act.

*Id.* at 18 (emphasis deleted). The Policy's notice clause specifies that "Notice to the Company under this policy shall be given in writing addressed to" a location in Warren, New Jersey. *Id.* at 2.

"Contractual language requiring notice 'as soon as practicable' has been construed by Texas courts as equivalent to 'within a reasonable time.'" *Chicago Ins. Co. v. W. World Ins. Co.*, 1998 WL 51363, at *2 (N.D. Tex. Jan. 23, 1998) (Buchmeyer, C.J.). When the relevant facts are undisputed, the question whether notice was given "as soon as practicable" or "within a reaso nable time" is a question of law for the court. *Id.* Here, the parties dispute neither the history of the COC litigation as recited herein nor the fact that the first formal notification given to Federal was the February 14, 2001 letter from Walker, CompUSA's Executive Vice President and General Counsel. Because this formal notification did not occur until 11 months after Halpin had been served, and not until six days after a jury verdict had been rendered against the Insureds in a trial in which they actively participated, the court concludes as a matter of law that the February 14, 2001 letter did not give Federal notice "as soon as practicable." "There is ample Texas authority that taking 11 months to notify an insurer is not 'as soon as practicable.'" *Id.* at *3 (citing, *e.g.*, *Allen v. W. Alliance Ins. Co.*, 162 Tex. 572, 349 S.W.2d 590, 594 (1961) (107 days after occurrence); *Klein v. Century Lloyd's*, 154 Tex. 160, 275 S.W.2d 95, 97 (1955) (32 days after occurrence)).

In view of the foregoing, the court now addresses the following questions to resolve Federal's motion: (1) Is actual notice to Federal sufficient? (2) Must Federal prove that it suffered actual prejudice from a lack of the contractually-specified written notice? (3) Was Halpin contractually precluded from giving Federal the required notice?

III

The Insureds contend that Federal received actual notice of the COC suit during March 2000, when a Federal underwriter obtained from the Internet a copy of CompUSA's Form 10-Q for the fourth quarter of 1999 in connection with the underwriting of the extended reporting period ultimately granted to the Insureds under the Policy. They maintain that such actual notice is sufficient to satisfy the Policy's notice provision. The court disagrees.

Even if Federal obtained actual notice of the COC suit in March 2000 via the Form 10-Q, this did not relieve the Insureds of their obligation to comply with the notice condition precedent of the Policy. As the Fifth Circuit has held regarding an analogous policy that Federal issued:

> The policy unambiguously limits Federal's liability to losses for wrongful acts reported to Federal in accordance with section 4. Specifically, the directors themselves had to provide written notice of any wrongful acts giving rise to an actual or potential claim, and such notice had to be mailed to Federal's New Jersey office. . . . [A]llowing constructive notice to satisfy the reporting requirements of section 4 would effectively "read-out" these unambiguous provisions. . . . Here, the D & O policy is a "claims-made" policy. Because notice of a claim or potential claim defines coverage under a claims-made policy, we think that the notice provisions of such a policy should be strictly construed.

*FDIC v. Barham*, 995 F.2d 600, 604 n.9 (5th Cir. 1993) (applying Louisiana law) (citations omitted and emphasis deleted).[3] Concluding that the notice provisions of such a policy should be strictly construed, the Fifth Circuit in *Barham* reasoned that while Louisiana courts "have not yet determined whether constructive notice may satisfy the reporting requirements of a claims-made policy,"

---

[3]The court recognizes that there are distinctions between the policy at issue in *Barham* and the one in the instant case, and that the court is quoting *dicta* from *Barham*. Nevertheless, the reasoning of *Barham*, coupled with settled principles of Texas law, appropriately guides the court in deciding the present case.

Louisiana law provides that "[a]bsent conflict with statute or public policy, insurers may by unambiguous and clearly noticeable provisions limit liability and impose such reasonable conditions as they wish upon the obligations they assume by contract." *Id.* (quoting *Breaux v. St. Paul Fire & Marine Ins. Co.*, 326 So.2d 891, 892-93 (La. App. 1976)).

Texas law is in accord. "Undoubtedly the parties to an insurance contract may make it in any legal form they desire and, in the absence of statutory prohibitions, insurers may limit their liability and impose whatever conditions they please upon their obligations not inconsistent with public policy." *Locomotive Eng'rs & Conductors Mut. Protective Ass'n v. Bush*, 576 S.W.2d 887, 890 (Tex. Civ. App. 1979, no writ) (quoting *Hatch v. Turner*, 145 Tex. 17, 193 S.W.2d 668, 669 (1946)); *Republic Nat'l Life Ins. Co. v. Spillars*, 368 S.W.2d 92, 94 (Tex. 1963) ("[W]here the language of an insurance contract is plain, it must be enforced as made."). "Courts strictly interpret notice provisions in a 'claims-made' policy." *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 659 (5th Cir. 1999) (interpreting Texas law). Accordingly, the court holds concerning this claims-made policy[4] that Federal and CompUSA contractually agreed, as a condition precedent, that written notice of a claim would be made as soon as practicable. Because there is no indication that such a limit on liability violates a Texas statutory prohibition or public policy, the notice provision must be enforced as written. The court therefore rejects defendants' reliance on actual notice not given in the manner the Policy required.

---

[4]The court concludes that the Policy at issue is a "claims-made" policy rather than an "occurrence" policy. *See infra* § IV.

IV

The court considers next whether Federal must demonstrate actual prejudice from the absence of the notice that the Policy requires. The court holds that it need not.

Under Texas law, the effect of the Insureds' noncompliance with the notice provisions contained in an insurance policy depends on whether it is a "claims-made" or an "occurrence" policy. "An 'occurrence' policy covers all claims based on an event occurring during the policy period, regardless of whether the claim or occurrence itself is brought to the attention of the insured or made known to the insurer during the policy period." *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 918 (Tex. App. 1988, writ denied). In contrast, "[a] 'claims-made' policy covers occurrences which may give rise to a claim that comes to the attention of the insured and is made known to the insurer during the policy period." *Id.*

As the Fifth Circuit observed regarding Texas insurance law:

> Contrary to Matador's apparent position, courts do not always require a showing of prejudice in order for an insurance company legitimately to deny coverage where the insured fails to comply with an insurance policy's notice provisions. Instead, the impact that untimely notice has on coverage depends on the type of insurance policy. For example, courts traditionally distinguish between two types of insurance policies: "occurrence" policies and "claims-made" policies. In the case of an "occurrence" policy, any notice requirement is subsidiary to the event that triggers coverage. Courts have not permitted insurance companies to deny coverage on the basis of untimely notice under an "occurrence" policy unless the company shows actual prejudice from the delay. In the case of a "claims-made" policy, however, notice itself constitutes the event that triggers coverage. Courts strictly interpret notice provisions in a "claims-made" policy. Thus, an insurance company may deny coverage under a "claims-made" policy without a showing of prejudice.

*Matador*, 174 F.3d at 658-59 (citations omitted).

- 14 -

The Policy states on its first page that

> THE EXECUTIVE LIABILITY AND INDEMNIFICATION, FIDUCIARY LIABILITY, OUTSIDE DIRECTORSHIP LIABILITY AND EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTIONS (WHICHEVER ARE APPLICABLE) ARE ALL WRITTEN ON A CLAIMS MADE BASIS. EXCEPT AS OTHERWISE PROVIDED, THESE COVERAGE SECTIONS COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. PLEASE READ CAREFULLY.

D. App. 1. *See Yancey*, 755 S.W.2d at 918-21 (holding that policy at issue that *inter alia* stated in block letters "THIS IS A 'CLAIMS MADE' POLICY READ CAREFULLY" was a claims-made policy). Despite this language, the Insureds contend that the grant of an extended reporting period under Endorsement No. 9 requires the court to treat the Policy as having been written on an "occurrence" basis. The court disagrees. Insuring clauses 1 and 2 provide that Federal shall pay all loss incurred on account of any claim first made during the policy period. The Policy also provides that "[a]ny Claim made during the extended reporting period shall be deemed to have been made during the immediately preceding Policy Period." *Id.* at 14 (emphasis deleted). Thus the effect of the extended reporting period is to allow certain claims made after the policy period has concluded to be treated as claims made within the policy period. Such an arrangement is fully consistent with the Policy's express language declaring it to have been written on a "claims made" basis. Moreover, in *Barham*, which involved a Federal directors and officers liability policy that contained an extended reporting period, the Fifth Circuit has held that the policy was "a claims made policy." *See Barham*, 995 F.2d at 602.

V

Halpin advances individually the contention that he was prohibited from providing notice to Federal. The court disagrees.

The Reporting and Notice provision of the Policy states:

> The Insureds shall, as a condition precedent to exercising their rights under this coverage section, give to the Company written notice as soon as practicable of any Claim made against any of them for a Wrongful Act.

P. App. 18 (emphasis deleted). The Policy separately provides:

> By acceptance of this policy, [CompUSA] agrees to act on behalf of all Insureds with respect to the giving and receiving notice of claim[.]

*Id.* at 3. In this second provision, CompUSA and Federal agreed that CompUSA would act on behalf of all insureds concerning giving and receiving notice of claims. The clause neither prohibited Halpin from giving notice nor excused him from the consequences o f failing to comply with the Policy's notice provision. The clause placed an obligation on CompUSA, it did not erect a prohibition against Halpin.[5] Accordingly, this contention is insufficient to preclude Federal from obtaining a declaratory judgment based on the notice condition precedent in the Policy.

\* \* \*

Because the court concludes as a matter of law that the Insureds' breach of the notice obligation constitutes a failure of a condition precedent to Federal's duty to provide indemnification under the Policy, the court grants Federal's February 13, 2002 motion for summary judgment and

---

[5]Even assuming *arguendo* that the Policy did prohibit Halpin from giving notice, the evidence indicates that it was within Halpin's power as CompUSA's President and CEO to cause CompUSA to give timely notice, as the Policy required.

declares that Federal is not obligated to indemnify CompUSA and Halpin in connection with the COC suit.

     **SO ORDERED.**

June 4, 2002

                        _____

                        SIDNEY A. FITZWATER
                        UNITED STATES DISTRICT JUDGE