United States Court of Appeals
Fifth Circuit

**F I L E D**

September 19, 2005

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
For the Fifth Circuit**

No. 03-11272

INTERNATIONAL INSURANCE CO.,

Plaintiff-Appellant-Cross-Appellee,

VERSUS

RSR CORPORATION; QUEMETCO, INC.; QUEMETCO METALS LIMITED, INC.;
formerly known as MURPH METALS, INC.; BESTOLIFE CORPORATION; and
REVERE SMELTING & REFINING CORPORATION OF NEW JERSEY;

Defendants-Appellees-Cross-Appellants.

Appeal from the United States District Court
For the Northern District of Texas, Dallas Division

(3-00-CV-0250-P)

Before WIENER, BARKSDALE and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

This is a suit and counterclaim for declaratory judgment regarding coverage issues under claims-made Environmental Impairment Liability ("EIL") insurance policies issued to RSR Corporation ("RSR") by International Insurance Co. ("International") that provide RSR with environmental impairment liability coverage in connection with RSR's activities at its lead

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

smelting establishment in West Dallas, Texas. The district court granted summary declaratory judgment for RSR on all coverage issues presented, except that the court granted judgment in favor of International decreeing that certain coverage was excluded under Exclusion 7(a) of the policy. International and RSR each appeal from the judgment insofar as it is adverse to them. We affirm.

## I. BACKGROUND

In 1981, the North River Insurance Company ("North River") issued four claims-made insurance policies to RSR and various related entitles. The policies provided successive layers of environmental impairment liability ("EIL") coverage. In 1993 International succeeded to the interest of North River, and RSR agreed to the substitution of International for North River as insurer. The policy originally covered the period from September 4, 1981 to September 4, 1982, but RSR later purchased an extension of the policy period to November 4, 1982, and then an extended reporting period from November 4, 1982, to November 4, 1983. Coverage was thus extended for alleged environmental impairment that occurred prior to the termination of the policy period and was reported during the extension period.

The parties' dispute concerns whether RSR is entitled to insurance coverage for environmental impairment caused by its lead smeltery on a site designated by the EPA in West Dallas, Texas. The site consists of approximately 13.6 square miles in West Dallas that includes residential, industrial, commercial, and retail

2

establishments. Secondary lead smelting operations conducted at the smeltery from the 1930s until 1984 caused lead pollution within the 13.6 square miles site. RSR acquired the smeltery in 1971.

A battery wrecking facility located near the smeltery was operated by RSR's subsidiary, Murph Metals. That facility received automobile batteries from common carriers, shredded them, and separated their lead paste from their plastic and rubber components. The plastic and rubber components were stockpiled on-site until they were removed. Part of the contamination of the site resulted from the use of the lead and battery chips by residents as fill material in residential driveways and yards.

In 1983 during the policy period, the West Dallas facility was the subject of several lawsuits alleging environmental pollution by the West Dallas facility. These actions involved various governmental authorities and several private personal injury and property damage suits. RSR notified North River of the personal injury and property damage suits and received North River's consent to settle some of the actions. North River paid over $24 million for RSR's settlements of the personal injury and property damages claims, and for defense costs. The parties formed an escrow agreement and a supplemental agreement in 1985 to provide for the payment of some of the claims against RSR.

In 1991, the EPA began conducting studies relating to soil contamination in parts of West Dallas. For purposes of investigation and cleanup, the EPA administratively divided the

3

West Dallas site into five Operable Units ("OUs"), labeled OU 1 through OU 5. OU 1 consists of a residential area including schools, churches, and parks, as well as private dwellings. The EPA reported finding lead contamination in OU 1 that required environmental remediation. Specifically, the EPA found: (1) airborne emissions originating from the smeltery; and (2) battery chip waste originating from the smeltery that was used as paving material in yards and driveways by residents of OU 1. During 1991 through 1995 the EPA initiated and conducted a two-phase removal cleanup action addressing the lead contamination in OU 1.

In 1993 RSR notified North River that it had received a notice of its potential liability under CERCLA from the EPA regarding the EPA's environmental remediation activities at the West Dallas site.[1] In 1998, after the EPA threatened to take immediate action against RSR, RSR and its related entities, Quemetco Metals, and Quemetco, Inc., entered into a tolling agreement with the EPA.

International filed suit seeking a declaratory judgment that it owed no duty under the EIL Policy to indemnify RSR against liability for the EPA's costs in remediating the environmental impairment of the West Dallas site because RSR had breached a condition to International's performance when it entered into the tolling agreement with the EPA without obtaining International's

---

[1] The parties do not dispute that this claim relates back to the claims made during the coverage period of the EIL Policy regarding the Dallas Pollution Claim and, therefore, as a "claim made" during the period of the EIL Policy.

4

written consent. International further argues that the remediation costs and expenses associated with the cleanup of the West Dallas site fell under Exclusions 12(c) and 7(a) of the policy. Additionally, International requested specific performance and asserted a claim for breach of contract contending that the escrow agreement it entered into with RSR in 1985 should be terminated. RSR asserted counterclaims for a declaratory judgment that it is entitled to indemnification for remediation costs and expenses and for breach of contract, fraudulent inducement, and violations of the Texas Insurance Code.

In ruling upon the parties' cross motions for summary judgment, the district court concluded that International was not required to indemnify RSR for its costs associated with OUs 2-5 of the site.[2] In respect to OU 1, the district court held that RSR is entitled to indemnification for cleanup costs and expenses resulting from the lead pollution, but that RSR is not entitled to coverage for remediation of contamination caused by the battery chips because of Exclusion 7(a) in the EIL Policy. The district court entered judgment for International on RSR's tort, contract, and statutory claims. We now affirm the district court's order.

## II. ANALYSIS

This Court reviews a district court's granting of summary judgment *de novo*. Baton Rouge Oil & Chem. Workers Union v.

---

[2] RSR does not appeal that ruling by the district court.

5

<u>ExxonMobil Corp.</u>, 289 F.3d 373, 376 (5th Cir. 2002).  Summary Judgment is appropriate where there are no genuine issues as to any material fact and the mover is entitled to judgment as a matter of law.  <u>Guardian Life Ins. Co. of America v. Finch</u>, 395 F.3d 238, 240 (5th Cir. 2004).

Because this case is before us on diversity jurisdiction, we must apply Texas's substantive insurance law in interpreting the insurance contract.  Our goal, sitting as an <u>Erie</u> court, is to rule the way the Texas Supreme Court would rule on the issues presented.  <u>Primrose Operating Co. v. National American Ins. Co.</u>, 382 F.3d 546, 564-65 (5th Cir. 2004).

A.

International contends that it is excused from its coverage obligation under the EIL policy because RSR breached Condition 3 of the agreement when it entered into the tolling agreement with the EPA in 1998 that barred RSR's statute of limitations defense to an EPA claim.  Condition 3 of the EIL provides that:

> The Insured shall not, without the consent in writing of the Insurers, make any admission or negotiate any offer, promise, or payment in connection with any incident or claim related to the Insurance herein expressed.

RSR argues that International must show that it was prejudiced by RSR's breach of Condition 3 before it may be declared to be free of its obligations under the insurance policy.[3]  Under Texas law,

---

[3] At First, RSR argues that because Condition 3 was only meant to apply to settlement offers and therefore did not apply to the

which is applicable to this diversity case, insurance policies are contracts which are subject to the applicable rules of Texas contract law. See <u>Hanson v. Production Co v. American Ins. Co.</u>, 108 F.3d 627, 630-31 (5th Cir. 1997); <u>Hernandez v. Gulf Group Lloyds</u>, 875 S.W.2d 691, 692 (Tex. 1994). "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." <u>Mustang Pipeline Co., Inc.</u>

---

tolling agreement at issue here, it did not breach Condition 3 when it entered into the agreement with the EPA. Under Texas law, however, if an insurance policy is worded so that it can be given only one reasonable construction, it must be enforced as written. <u>State Farm Fire & Cas. Co. v. Reed</u>, 873 S.W.2d 698, 699 (Tex. 1993). As the district court correctly found, RSR's argument fails at this point because when RSR entered into the tolling agreement it "negotiated" a "promise" "in connection with an incident or claim."

Second, RSR argues that it obtained International's consent or implied consent before entering into the tolling agreement. RSR makes no allegation, however, that International consented to the tolling agreement in writing. RSR's argument fails here because Condition 3's express language requires written consent by International.

Third, RSR argues both that International has waived its right to enforce Condition 3 and that International is estopped from asserting RSR's breach of Condition 3. Under Texas law, an insurance company may waive a condition precedent to performance on an insurance policy through the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." <u>Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.</u>, 174 F.3d 653, 660 (5th Cir. 1999). Estoppel applies when one party reasonably relies on the other party's conduct or statements and suffers harm as a result. <u>Id.</u> Here, International's silence after RSR notified it of the tolling agreement was not sufficient to constitute an "intentional relinquishment" of its rights, and therefore does not constitute waiver. Therefore, RSR's estoppel theory also fails.

7

v. Driver Pipeline Co., Inc, 134 S.W.3d 195, 196 (Tex. 2004). To determine whether a breach is material, "courts will consider, among other things, the extent to which the non[-]breaching party will be deprived of the benefit that it could have reasonably anticipated from full performance.... The less the non-breaching party is deprived of the expected benefit, the less material the breach." Hernandez, 875 S.W.2d at 693.

The Texas Supreme Court and this court sitting in diversity and applying the substantive law of Texas, have found that in some cases an insurer must demonstrate that it was prejudiced by the insured's breach of a condition in order to be excused from performance, but in other cases prejudice is presumed and the insurer is not required to show prejudice. Compare Hanson, 108 F.3d at 628 (holding that an insurer must show prejudice) and Hernandez, 875 S.W.2d at 692 (same), with Federal Ins. Co. v. CompUSA, Inc., 319 F.3d 746, 754 (5th Cir. 2003) (finding that insurer was not required to show prejudice) and Matador, 174 F.3d at 658-59 (same).

1.

In Hanson we found a prejudice requirement after an insured's breach of a notice provision, and in Hernandez the Texas Supreme Court found such a requirement upon the breach of a settlement-without-consent provision. Hanson, 108 F.3d at 628; Hernandez, 875 S.W.2d at 692. In CompUSA and Matador we found no such requirement for breach of a notice clause in a claims-made policy. CompUSA,

8

319 F.3d at 754; Matador, 174 F.3d at 658-59. As explained above, the policy in this case is a claims-made policy.

To understand the difference between the holding in Hanson and those in CompUSA and Matador——the cases addressing the breach of notice provisions——it is helpful to bear in mind the distinction between claims-made and occurrence-based policies. Claims-made policies cover the insured in respect to an occurrence when the claim based thereon is made against the insured, and the insured notifies the insurer, during the policy period. FDIC v. Mijalis, 15 F.3d 1314, 1330 (5th Cir. 1994). Occurrence-based policies, on the other hand, cover claims based on an event that happened during the policy period, even when a third-party does not make a claim against the insured during the policy period. CompUSA, 319 F.3d at 754.

Notice provisions, which are generally contained in both claims-made and occurrence policies, are provisions in insurance contracts that, in a claims-made policy, require the insured to give the insurer prompt notice of a potential claim against the insured and in an occurrence policy, require the insured to give prompt notice of an event that the insured seeks recovery for. The claims-made EIL policy issued to RSR by International contains a notice provision in Condition 2 of the policy, which requires RSR to "promptly give written notice to the Insurers of any incident or claim or proceedings relating to the Insurance herein...." Condition 3, on the other hand, is a consent clause that does not

9

require RSR to give International "notice" of an event, but instead requires International's consent before "mak[ing] any admission or negotiat[ing] any offer, promise or payment in connection with any incident or claim."

Our past holdings that an insurer was not required to show that it was prejudiced by an insured's breach of a notice provision were based on the argument that it is notice to the insurer of the claim that triggers an insured's coverage in a claims-made policy, and the parties therefore specifically negotiate the terms of the notice provision. CompUSA, 319 F.3d at 754; Matador, 174 F.3d at 659. On the other hand, in the occurrence-based policies of Hanson (which involved notice provisions) and Hernandez (which involved a consent provision), coverage had already been triggered by an "occurrence" before the insured's duty to give notice to the insurer arose. Thus, the insurer was required to show that it was prejudiced by the insured's breach in order to be excused from performance.

In the present case, although the policy between RSR and International is a claims-made policy like the policy in Matador, this case is actually more like the Hanson/Hernandez line of cases because a valid claim was made against RSR within the appropriate contractual period and coverage was therefore triggered. Because Condition 3 is not a notice provision, we conclude that Matador's holding finding no prejudice requirement in claims-made policies is not applicable. Here, the distinction between claims-made and

10

occurrence-based policies is not helpful to our analysis, and we find that the prejudice requirement imposed by the Texas Supreme Court in <u>Hanson</u>, which also dealt with consent clause, applies. We therefore find that International is not excused from performance without demonstrating that it was prejudiced by RSR's breach of Condition 3.

2.

International argues that even if it is required to show prejudice, there was inherent prejudice here, because RSR's tolling agreement with the EPA effectively eliminated a statute of limitations defense that would have existed if the EPA failed to timely file its claim. It is undisputed, however, that the EPA told RSR that it would immediately file a claim against RSR if it did not enter into the tolling agreement. If RSR had declined to enter the tolling agreement, the EPA's immediate filing of the claim would have left International no better off. Because International was not prejudiced by RSR's breach of Condition 3, International is not excused from performance on the basis of that breach.

B.

International next argues that the district court erred when it held that because OU 1 was not a "waste disposal site" within the meaning of Exclusion 12(c) of the EIL policy, International was not exempt from providing RSR with coverage for contamination in

that area.[4]  Exclusion 12(c) provides that the policy does not apply to or include liability for or costs or expenses of or in connection with:

> (c) upgrading, monitoring, neutralizing, restoring, landfilling, cleaning-up or inactivating any *waste disposal sites* used directly or indirectly by the Insured or for which they may otherwise be responsible. (Emphasis added).

Under Texas law, a court must give the terms used in an insurance policy their ordinary and generally accepted meaning. <u>Jarvis Christian College v. Nat'l Union Fire Ins. Co.</u>, 197 F.3d 742, 746 (5th Cir. 1999).  When a provision in an insurance policy that puts a limitation or exclusion on coverage is reasonably susceptible of more than one meaning, Texas law instructs a court to adopt the interpretation that provides for coverage.  <u>Id.</u>

Here, International is unable to present any authority classifying OU 1, which consists of residential areas, schools, churches, parks, recreational facilities, and day care centers, as

---

[4] We disagree with RSR's argument that International did not timely and adequately raise this issue in its pleadings and we therefore review the merits of International's argument.  Although International may not have fully developed its argument in its original pleadings, in its third amended complaint International clearly argued that Exclusion 12(c) "precludes coverage for any liability for cleanup costs sought by the EPA."  Moreover, although the pretrial order does not contain any indication that International intended to rely on Exclusion 12(c) as to OU 1, the district court's order granting summary judgment to RSR specified that the issue was discussed at the pretrial conference and it had ordered supplemental briefing on the issue.  Therefore, we find that International did not untimely raise its defense that Exclusion 12(c) to OU 1 applied.

a "waste disposal site." International's only argument is based on the EPA's allegations that the pollution in OU 1 consists of "improper disposal or use of waste material from the smelting process" and relies on a mis-reading of Exclusion 12(c).

International disputes the district court's reading of Exclusion 12(c), contending that the exclusion applies to disposal of waste at sites that are either "direct" or "indirect" waste disposal sites. International would define a "waste disposal site" under Exclusion 12(c) as "any site where waste disposal occurs." A straightforward reading of the provision, however, shows that the language "directly or indirectly" modifies the insured's "use" of the site, not the site itself. Exclusion 12(c) therefore excludes coverage against liability for a waste disposal site established or maintained for the purpose of disposing of waste. Because allowing residence owners to use waste for their driveways does not establish a waste disposal site, OU 1 is not a waste disposal site within the meaning of the policy between RSR and International.

C.

On cross-appeal, RSR argues that the district court erred when it held that Exclusion 7(a) of the EIL Policy precluded RSR from recovering from International for RSR's liability resulting from the battery chips that were used as fill in residents' driveways and yards. Exclusion 7(a) provides that the policy does not apply to or include:

Liability for Environmental Impairment arising from:

13

(a) Any commodity, article or thing supplied, repaired, altered, or treated by the insured and happening elsewhere than at the insured's premises after the insured has ceased to own or exercise physical control over the commodity, article, or thing supplied, repaired, altered, or treated.

RSR disputes the construction that the district court gave to the words "thing" and "supplied" in the context of Exclusion 7(a). RSR first argues that the district court erred in refusing to consider extrinsic evidence concerning the meaning of the word "thing" in Exclusion 7(a) in deciding that the battery waste that was used as fill material was a "thing."[5] RSR argues that the district court should have examined evidence that Exclusion 7(a)'s drafter stated that the phrase "commodity, article, or thing supplied, altered, repaired, or treated" was not meant to refer to "waste products."[6] Under Texas law, however, the terms used in an

_____

[5] Both parties argue that the Delaware Supreme Court's decision in Monsanto Co. v. International Ins. Co., 652 A.2d 36, 40 (Del. 1994), gives support to their argument. Monsato interpreted the very same exclusion——Exclusion 7(a)——against the very same defendant——International——and did examine extrinsic evidence to determine that Exclusion 7(a) did not apply to solid waste. That case, however, was based on an interpretation of Missouri law, which allows for the admission of extrinsic evidence even if the contract is not ambiguous. Id. at 38. Texas law, on the other hand, requires that a court find that the contract is ambiguous before admitting extrinsic evidence is more strict, and will not allow extrinsic evidence to create an ambiguity where not exists. Nat'l Union, 907 S.W.2d at 520.

[6] RSR cites to a treaty that defines a "products hazard" exclusion to argue that Exclusion 7(a) is a products hazard exclusion and therefore was only meant to apply to an insurer's liability for bodily injury and property damages that arise from the insured's products and occurs away from the insured's property and not for liability from solid waste. That argument, however,

14

insurance policy are to be given their ordinary and generally accepted meaning. Jarvis, 197 F.3d at 746. Extrinsic evidence is only admissible to assist a court in determining the parties' intended definition of an ambiguous contract and is never admissible to create an ambiguity in an insurance contract that is worded in a way that gives it a "definite or certain legal meaning." Nat'l Union, 907 S.W.2d at 520. The purpose of the provision clearly is to exclude coverage in respect to commodities and articles incorporating or affected by waste or polluted matter that have been transferred to a third person. "Thing" clearly includes items, other than commodities and articles, which have been so affected and transferred. Consequently, "thing" necessarily includes "waste material" because "waste material" is definitely a contaminated substance that could be transferred to third persons. Consequently, we do not believe that "thing" can be said to be ambiguous in the context of this provision of the EIL policy. Because Texas law prohibits the admission of extrinsic evidence without a showing of ambiguity, the district court was correct not to examine RSR's proposed extrinsic evidence. The waste material at issue here is a "thing" within the meaning of Exclusion 7(a).

RSR next argues that the district court's definition of the word "supplied" is overly broad because it did not require that RSR

---

overlooks the difference between Exclusion 7(a) and a normal "products hazard" exclusion, with Exclusion 7(a) being written much more broadly than products hazard exclusions are.

15

"intend" to make the waste material available for use by others. As the district court explained:

> The common definition of "supply" is to "add as a supplement, to provide for, to make available for use, to satisfy the needs or wishes of...." Merriam-Webster's Collegiate Dictionary at 1184. The evidence indicates that after the batteries were taken apart, the rubber chips that were later used as fill were stockpiled on the smelter premises. Although the precise method of distribution is unclear, it is undisputed that the battery chips were found in fill throughout OU 1 over a large geographical area.... RSR did "supply" the battery chips because they were "made available" and were used throughout OU 1 as fill.

We agree with the district court's reasoning and find that it is not necessary to know the "precise method of distribution" to conclude that RSR supplied and made available the waste material to the residents. It cannot be presumed that such a widespread practice by the residents of West Dallas could have taken place without the knowledge and consent of RSR.

RSR's final argument relies on Texas law providing that courts must read a contract as a whole and give effect to all of its parts. State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995). Based on that principle, RSR argues that the district court's reading of Exclusion 7(a) nullifies the EIL Policy's coverage for environmental impairments, which are defined as the "dispersal, disposal, release, or escape of solid contaminant."

RSR's argument fails, because it is based on an incomplete reading of the agreement. Exclusion 7(a) is specifically limited in application to things that the insured no longer owns and environmental impairment liability that occurs away from the

16

insured's premises. The contract's definition of "Environmental Impairment" does not include either of those limitations, so it is clear that Exclusion 7(a) is a specific exclusion on certain types of environmental impairment liability rather than an exclusion that encompasses all environmental liability. Thus, the district court did not err when it found that the RSR's liability for battery chip contamination fell under Exclusion 7(a).

D.

Finally, International argues that the district court erred in refusing to terminate the escrow account that the parties established in 1985 to fund the defense and settlement of the "Dallas Pollution Claim." When the parties agreed to create the account they entered into an escrow agreement and a contemporaneous supplemental agreement that set the terms of the account. The terms of these agreements are governed by New York law.

Under New York law, the interpretation of an unambiguous contract is a question of law for the court. Ruttenberg v. Dadidge Data Systems Corp., 626 N.Y.S.2d 174, 175 (N.Y. App. Div. 1995). A court should ascertain the intent of the agreement by examining the document as a whole, giving effect to the intent of the parties as revealed by the structure and content of the contract. Reda v. Eastman Kodak Co., 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996).

According to the escrow agreement in this case, the funds were to be used "only for the purpose of settling the personal injury and property damage lawsuits identified herein as part of the Dallas Pollution Claim" and to pay the escrow agent's fees and

17

expenses. The agreement specifically lists four personal injury lawsuits and an "enforcement suit" by the City of Dallas against RSR as part of the "Dallas Pollution Claim," but also states that the "Dallas Pollution Claim" includes "other lawsuits, threatened lawsuits or demands which, after the date of this agreement, may arise out of the same facts, circumstances, emissions and/or pollutants which are referred to above." The agreement provides for termination of the escrow account when RSR notifies the escrow agent in writing that "those portions of the Dallas Pollution Claim, referred to herein, have been settled...."

International argues that the termination provision applies and that the district court erred in not terminating the escrow account. Specifically, International points out that all of the claims that are named in the agreement have been settled or dismissed. International's argument, however, cannot succeed under the plain terms of the agreement, which clearly contemplate the fund applying to lawsuits beyond those specifically listed in the agreement.[7] Because the EPA's claim pertaining to OU 1 falls within the definition of the "Dallas Pollution Claim" and numerous

_____

[7] In addition to the language quoted above, there are numerous references throughout the agreement and supplemental agreement that make even more clear that the agreement applied to lawsuits outside of those specifically listed. For example, when the agreement lists the four named personal injury case, it explains that "to date" the personal injury cases within the "Dallas Pollution Claim" are those four. The agreement also covers threatened lawsuits, which it states encompass the enumerated lawsuits as well as "other lawsuits, threatened lawsuits or demands which ... may arise out of the same facts, circumstances, emissions and/or pollutants which are referred to in the lawsuits and threatened lawsuits...."

18

other lawsuits have been filed against RSR in state and federal court, the district court did not err when it did not terminate the escrow account.[8]

CONCLUSION

For these reasons, we affirm the district court's refusal to order termination of the escrow account and grant of summary judgment declaring coverage in favor of RSR on all issues except in respect to Exclusion 7(a), and we affirm the court's judgment in favor of International denying coverage on the basis of that

---

[8] International further argues that New York caselaw suggests that once the "essential purpose" of an escrow agreement is fulfilled the agreement should be terminated. Calcagno v. Drew, 694 N.Y.S.2d 248, 249 (N.Y. App. Div. 1999). As explained above, however, it is clear that because lawsuits that fall within the parties' definition of the "Dallas Pollution Claim" are still pending, the "essential purpose" of the escrow account has not been fulfilled.

Additionally, International argues that although the escrow agreement states that the agreement will terminate when RSR gives written notification to the escrow agent that the Dallas Pollution Claim has been settled and paid, it was not the parties' intent when drafting the agreement to give RSR sole discretion to continue the escrow agreement and withhold consent for termination when the purpose of the escrow agreement has been fulfilled. That argument becomes irrelevant, however, because it is clear from reading the escrow agreement's purpose has not been fulfilled when there are lawsuits still pending that fall within the agreement's definition of the "Dallas Pollution Claim." Thus, even if RSR should not have sole discretion to terminate the agreement, that does not matter as long as the agreement's essential purpose has not been fulfilled.

Finally, International argues that equitable principles and New York law support the termination of the escrow agreement because the account only contains $150,000 and the termination of the agreement will not hurt RSR or deny it any of its rights. Although that may be true, RSR cites to no authority (under New York or other case law) supporting the principle that an escrow account should be terminated for equitable reasons when by its own terms it should not be terminated.

19

exclusion.

AFFIRMED.